UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ANDRE KELLEY,

                                             Plaintiff,

      vs.

GLENN S. GOORD, Commissioner of
DOCS; FLOYD BENNETT,                    9:01-CV-1926
Superintendent; DOCTOR CHEW[1];        (J. Sharpe)
M.L. HOLLINS, Superintendent;
DOCTOR SEN; RAY GODY, IGRC,
Supervisor,

                                        Defendants.

_____

APPEARANCES                         OF COUNSEL

ANDRE KELLEY
Plaintiff pro se, 00-B-1596
Mohawk Correctional Facility
6100 School Road, Box 8451
Rome, New York 13442

ELIOT SPITZER                     MARIA MORAN
Attorney General of the           Asst. Attorney General
State of New York
Attorney for defendants
615 Erie Boulevard, West, Suite 102
Syracuse, New York 13204-2455

## REPORT-RECOMMENDATION

    This matter has been referred to me for Report and Recommendation by the

Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. §

_____

    [1] Doctor "Chew" is actually Dr. Cheng Yin, M.D., he has been served and has appeared by counsel in this action.  Dr. Yin will be referred to by his correct name in this recommendation.

636(b) and Local Rules N.D.N.Y. 72.3(c).

In this civil rights complaint, plaintiff alleges that he has been denied

constitutionally adequate medical care and access to courts.

Plaintiff seeks substantial monetary relief, and appears to seek some type of

injunctive relief.[2]

Presently before the court is defendants' motion for summary judgment

pursuant to FED. R. CIV. P. 56.  (Dkt. No. 49).  Plaintiff has responded in opposition

to the motion. (Dkt. No. 50).  For the following reasons, this court agrees with

defendants and will recommend dismissal of the complaint.

## DISCUSSION

### 1.   Summary Judgment

Summary judgment may be granted when the moving party carries its burden

of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56;

*Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted).

"Ambiguities or inferences to be drawn from the facts must be viewed in the light

most favorable to the party opposing the summary judgment motion." *Id*.  However,

---

[2] Plaintiff adds a request for "computation of time" after each request for monetary relief from each defendant.  It is unclear what plaintiff is referring to, however, the court notes that if he is requesting some shortening of his period of incarceration, he may not bring such a request in this civil rights case.  A claim for release or for shortening of the period of incarceration would have to be brought as a petition for habeas corpus under 28 U.S.C. § 2254.  In any event, even if plaintiff prevailed in this action, he would not be entitled to speedier release since the alleged violations in this case are unrelated to his criminal conviction or to the length of his sentence.

when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id*. *See also Burt Rigid Box v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002)(citations omitted).

**2.    Service of Process**

Defendants argue that defendant Ray Gody, the Inmate Grievance Resolution Committee (IGRC) Supervisor, was a fellow inmate of plaintiff's and was never served in this action.  The Federal Rules require that a defendant be served within 120 days of filing the complaint. FED. R. CIV. P. 4(m).  The failure to serve a defendant within 120 days of filing the complaint may be a ground for dismissal of the complaint. *Id.*  It is true that a pro se, *in forma pauperis* plaintiff may rely upon the United States Marshal to properly serve the summons and complaint. *Romandette v. Weetabix*, 807 F.2d 309, 311 (2d Cir. 1986).

Plaintiff attempted to have the Marshal serve the summons and complaint on former inmate Gody.  When service was attempted at Oneida Correctional Facility, the Marshal received a notice stating that defendant Gody was a former inmate who had been paroled from Queensboro Correctional Facility on August 7, 2001. (Dkt.

No. 28 at p.2).  Thus, the Marshal indicated on the USM-285 form that although

service by mail was attempted on July 29, 2002, it was not executed (U-E).

Plaintiff was sent a copy of this form as indicated on the back of the USM-285

form. (Dkt. No. 28).  No further attempt has been made at instructing the Marshal

on where to serve defendant Gody, and the 120 day time limit has long passed.

Therefore, this action may be dismissed as to this defendant for failure to serve.[3]

## 3.    Facts

Plaintiff was placed in the custody of the New York State Department of

Correctional Services (DOCS) on August 3, 2000 at Wende Correctional Facility

(Wende).  Prior to plaintiff's transfer to Wende to begin his DOCS sentence, he was

held in the Erie County Holding Center. Defendants' Ex. B-1.  On August 9, 2000,

plaintiff was transferred to Elmira Correctional Facility (Elmira) from Wende.

Defendants' Ex. A.  He remained at Elmira until August 28, 2000 and was then

transferred to Oneida Correctional Facility (Oneida), where he arrived on August

29, 2000. *Id.*

Plaintiff suffers from Buerger's Disease, also known as thromboangitis

---

[3] The court also notes that the complaint would have been dismissed as against defendant Gody on the merits as discussed below.  Additionally, as a fellow inmate, and without any claims of conspiracy, defendant Gody was not acting under color of state law, and therefore could not be sued under 28 U.S.C. § 1983.

obliterans.[4]  He also has symptoms of Raynaud's Phenomenon,[5] possibly related to,

or as a result of, the Buerger's Disease.  Plaintiff also suffers from asthma.

Plaintiff's health transfer information sheet, completed at the Erie County Holding

Center indicates that prior to plaintiff's transfer to Wende, plaintiff had been

prescribed the antibiotic Augmentin, which was to be discontinued on August 8,

2000. Defendants' Ex. B-1, B-2.  The health transfer information sheet also

indicates that plaintiff needed a referral "for vascular surgery" due to ulcers on his

right leg. *Id.* at B-1.

On August 3, 2000, plaintiff was examined by Dr. D. O'Connell, M.D. at

Wende. Defendants' Ex. B-4.  Dr. O'Connell noted plaintiff's history of Buerger's

Disease, and appears to have renewed plaintiff's Augmentin prescription, although

for only 500 milligram pills rather than the 875 milligrams that had been originally

prescribed. *Id.*  Dr. O'Connell also stated in his notes that plaintiff had a "healing

---

[4] Buerger's disease causes obstructed blood flow the blood vessels, and is characterized by inflammatory changes in small and medium sized arteries and veins, occurring in cigarette smokers, predominantly in men ages 20 to 40. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 1788-90 (17th Ed. 1999).  Ulcers and gangrene may occur as a result of this disease. *Id.* at 1789.

[5] Raynaud's Disease is most common in young women, and the origin of the disease is spontaneous and unknown. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 1790 (17th Ed. 1999).  Raynaud's "Phenomenon" is generally secondary to other conditions such as Buerger's Disease. *Id.*  Both conditions are characterized by intermittent blanching or cyanosis of the digits, precipitated by exposure to cold or by emotional upset. *Id.*  Raynaud's Disease is differentiated from Raynaud's Phenomenon by the absence of an underlying cause, "bilateral involvement", and the absence of gangrene. *Id.*  Additionally, in Raynaud's Disease the symptoms do not worsen despite their presence for many years. *Id.*  In Raynaud's Phenomenon there is generally a "recognizable" underlying cause and the treatment depends on recognition and treatment of the underlying disorder. *Id.* at 1790-91.

wound" on his right ankle that was approximately the size of a quarter.  Dr.

O'Connell reviewed wound care with plaintiff, instructed plaintiff on "S & S"

(signs and symptoms) of infection, and told plaintiff to "notify medical" if there

were any signs of infection. Defendants's Ex. B-4.  On August 7, 2000, plaintiff

asked for "more Augmentin." *Id.*  The note on plaintiff's medical record shows that

"band-aids" were given to plaintiff for his leg ulcers and that the doctor would be

consulted about the Augmentin. *Id.*  Plaintiff left Wende two days later.

Upon his arrival at Elmira on August 9, 2000, a nursing assessment was

completed, indicating that plaintiff was being treated for "NIDDM" (non-insulin

dependent diabetes mellitus), asthma, Buerger's Disease, and leg ulcers.

Defendants' Ex. B-3.  It was also noted that plaintiff's left second toe and his left

little finger had been amputated. *Id.*  Plaintiff had a complete physical, performed

by defendant Dr. Yin on August 21, 2000. Yin Aff. ¶ 4, Defendants' Ex. B-5-10.

Dr. Yin noted that plaintiff had bilateral lower leg ulcers with crusts and a history of

Buerger's Disease. Yin Aff. ¶ 5; Defendants' Ex. B-6.  Dr. Yin wrote "Rx PRN"

indicating that prescriptions for this condition would be "as needed." Defendants'

Ex. B-6.  On August 22, 2000, plaintiff wrote a note to the charge nurse requesting

that his asthma medication (Albuterol) be renewed and that he be given topical

antibiotic ointment as well as oral antibiotics for his leg ulcers. Defendants' Ex. B-

11.  The Albuterol prescription was renewed on August 24, 2000 with Dr. Desai's

approval, and plaintiff was scheduled for a medical appointment on August 25, 2000. Yin Aff. ¶ 6; Defendants' Ex. B-4, B-12.

On August 25, 2000, Dr. Yin examined plaintiff for the ulcers on his legs. Dr. Yin noted plaintiff's Buerger's Disease, noted an erythema patchy lesion on his right leg, with "crusts on the distal legs", and prescribed Unna boots[6] for both of plaintiff's legs which were to be changed after one week. Yin Aff. ¶ 7; Defendants' Ex. B-12.  Dr. Yin also prescribed 400 milligrams of Motrin to be taken three times daily for one month. *Id.*  Dr. Yin states in his affidavit that he did not prescribe antibiotics for plaintiff because he did not observe any signs of infection when he examined plaintiff on August 25, 2000 and because plaintiff's August 21, 2000 lab work showed a white blood cell count that would have made prescribing antibiotics inappropriate. Yin Aff. ¶ 8.  Dr. Yin also states that no permit for special footwear was indicated at that time. *Id.*  Plaintiff was transferred to Oneida three days later, and Dr. Yin was no longer responsible for plaintiff's medical care. Yin Aff. ¶ 9.

Plaintiff arrived at Oneida on August 29, 2000 and was examined by a nurse who noted all of his medical problems and prescriptions on plaintiff's Ambulatory Health Record (AHR). Defendants' Ex. B-12.  Plaintiff was examined by defendant Dr. Sen on August 30, 2000. Defendants' Ex. B-3.  Plaintiff told Dr. Sen that he

---

[6] Unna boots are formed by applying layers of a paste to the leg and covering the paste with a spiral bandage and successive coats of past. Yin Aff. ¶ 7.  The paste hardens, resulting in a rigid boot, used as "compression therapy" for circulatory insufficiency.

suffered from Buerger's Disease and had suffered from ulcers on both of his legs for the past six to seven years. *Id.*  Plaintiff told Dr. Sen that he had stopped smoking.[7] *Id.*  Dr. Sen noted the measurement of the wounds on plaintiff's right and left ankles.  He ordered the Unna boots changed and then ordered that they be changed weekly. *Id.*  The notes also indicate that there were no Unna boots in stock at the time so plaintiff was given an alternative dressing until the Unna boots came in. *Id.* at B-12-13.

On September 1, 2000, plaintiff was examined on an emergency basis because plaintiff complained that his nose had been bleeding for approximately one week. Defendants' Ex. B-14-15.  The nurse noted a scant amount of bleeding and attempted to stop the bleeding by administering pressure to the bridge of plaintiff's nose and applying ice to the back of his neck. *Id.*  When the bleeding did not stop, Dr. Sen was notified.  Dr. Sen ordered the plaintiff taken to Oneida City Hospital, where plaintiff's nostrils were packed with gauze which was to be removed in three to four days. *Id.* at B-15.  Plaintiff was returned to the correctional facility the same day, (September 1, 2000), and was admitted to the infirmary for observation and treatment. Defendants' Ex. B-16.

At that time, Dr. Sen prescribed the antibiotic Erythromycin as well as

---

[7] On August 9, 2000, plaintiff told the individual who initially examined him that he smoked three cigarettes per day. Defendants' Ex. B-5.  The court notes that Buerger's Disease has been associated with cigarette smoking. MERCK MANUAL at 1789.

Tylenol for pain. *Id.* at B-17.  Dr. Sen also ordered that plaintiff's Unna boots be changed weekly and his Glipizide[8] be held until plaintiff's lab work was completed. It appears that plaintiff remained in the infirmary for several months until June 25, 2001. *Id.* at B-106, 147.  Plaintiff was monitored ***several times per day*** during this stay. *Id.*  On September 5, 2000, Dr. Sen prescribed another antibiotic, Cipro, to be started after plaintiff finished the Erythromycin prescription. Defendants' Ex. B-17, 28.  Dr. Sen noted that plaintiff's nasal pack had been removed, and that plaintiff had no further bleeding, but that plaintiff had been scheduled for an Otolaryngologist appointment on September 13, 2000. *Id.* at B-28.  Dr. Sen also requested a vascular surgery consultation. *Id.* at B-17.  Dr. Sen noticed that plaintiff's right great toe was swollen and tender, which was similar to what happened to the toe on plaintiff's left foot that ultimately had to be amputated.[9] *Id.* The nurses' notes between September 1, 2000 and September 5, 2000 also indicate that plaintiff's Unna boots were intact. *Id.*  The Unna boots were changed on September 6, 2000, and it was noted that plaintiff's ulcers were still present on both ankles. *Id.*

Plaintiff was examined on September 11, 2000 at the Vascular Surgery Clinic

---

[8] Glipizide is a medication taken as an adjunct to diet in individuals with non-insulin dependent diabetes (NIDDM). PHYSICIAN'S DESK REFERENCE 2606 (57th Ed. 2003).  There are indications in plaintiff's medical records that he was occasionally prescribed this drug.

[9] Plaintiff had already had two amputations prior to entering DOCS.  He had a toe and a finger amputated.

at University Hospital (SUNY) in Syracuse, New York.  Plaintiff's Unna boots were removed without difficulty, the wounds were cleaned and boots were reapplied without difficulty. Defendants' Ex. B-61.  Plaintiff was advised to keep his feet elevated as much as possible. *Id.*  A Kling (dry gauze) dressing was placed over the Unna boots. *Id.*  The doctor stated that the Unna boots should be changed weekly and that plaintiff should return in two months if the wounds were not healed. *Id.*  Plaintiff was also given instructions on the care of his Unna boots and instructions on symptoms that might indicate further problems. *Id.* at B-62.  On September 12, 2000, after plaintiff was returned to the facility, Dr. Sen repeated and supplemented the SUNY physician's instructions on the facility Health Care Provider Order form. *Id.* at B-17-18.  A nursed reviewed and signed these instructions. *Id.* at B-18.

Plaintiff was examined by an Otolaryngologist from the Walsh Regional Medical Unit (RMU) on September 13, 2000. Defendants' Ex. B-63-64.  This examination is also noted on plaintiff's infirmary progress notes. *Id.* at B-19.  The doctor determined that plaintiff's nose bleeding was secondary to his underlying Buerger's disease and prescribed nasal spray, bacitracin ointment, and a follow-up appointment in three months. *Id.* at 64.  Dr. Sen wrote the specialist's instructions on the plaintiff's facility Health Provider Order form as well as in plaintiff's infirmary progress notes. *Id.* at B-19, 30.

10

On September 15, 2000, it was noted by a nurse in the infirmary that plaintiff continued to have pain and drainage from the nail on his right great toe. *Id.* at B-30. Plaintiff's Unna boots were "in place" and he was out of bed for short periods. *Id.* Dr. Sen ordered the antibiotic Keflex to be taken along with the Cipro that had been previously prescribed. *Id.* at B-19, 30.  Dr. Sen also ordered a podiatry consultation for the in-grown nail on plaintiff's right great toe. *Id.* at B-19.  Dr. Sen added the word "(soon)" after the request for the podiatry consultation. *Id.*

On September 18, 2000, the nurse in the infirmary noted that plaintiff's lateral right ankle sore was still open, but that 90% of the other areas were healed with dry skin. *Id.* at B-31.  There was minimal pain in the legs, but plaintiff was still complaining of pain in his toe. *Id.*  On September 19, 2000, the nurse stated that plaintiff's Unna boots were intact, but was still complaining of toe pain. *Id.*

Dr. Sen examined plaintiff again on September 20, 2000 and noted that plaintiff's right great toe was a little less swollen due to the antibiotics, and that plaintiff's podiatrist appointment had been scheduled for October 4, 2000. *Id.*  Dr. Sen examined plaintiff again on September 21, 2000 and noted that the leg ulcers were healing well, and that the left leg was almost completely healed. *Id.* at B-32. The swelling in the right toe was gone, but the toe was still painful due to the in-grown toe nail. *Id.*  The nurse noted that plaintiff requested Tylenol with "good effect", that his dressing was dry and intact, and that no further drainage was noted

11

on the right hallux area. *Id.*  Benadryl was administered to plaintiff at approximately

10:35 p.m., but plaintiff voiced no complaints at that time. *Id.*

The Keflex was discontinued by Dr. Sen on September 22, 2000. *Id.*  On

September 26, 2000, plaintiff's progress notes indicate that the ulcers on both legs

were healing well, and that he continued to use the Unna boots, but that he still had

pain in his toe. *Id.* at B-33.  Tylenol was administered for the pain. *Id.* On October

2, 2000, the nurse noted that plaintiff's dressing was changed, but that the tip of his

right great toe was purple and cold to the touch. *Id.* at B-34.

On October 4, 2000, plaintiff was examined at the Walsh RMU by podiatrist,

Dr. Baldauf. *Id.* at B-34, 65-66.  In Dr. Baldauf's summary, he states that he

discussed the risks with plaintiff and told him that he would risk losing his toe if

nothing were done with the nail, but that the surgical procedure itself could cause

problems. *Id.* at B-66.  Dr. Baldauf then removed part of plaintiff's toenail. *Id.* at B-

34, 66, 68.  Dr. Baldauf ordered Keflex, Betadine warm foot soaks, Silvadene

cream, and light dressings to be applied for two weeks. *Id.* at B-66.  Dr. Baldauf

ordered Tylenol # 3 for pain and a follow-up appointment on October 25, 2000. *Id.*

Dr. Sen noted all of these orders on plaintiff's facility records. *Id.* at 20, 34.

Dr. Sen examined plaintiff on October 5, 2000 and noted that the dressing on

his right toe had been changed and that it looked "clear" with no discharge or

discoloration. *Id.* at B-34.  Although Dr. Sen stated that pedal pulses were present,

he also noted that plaintiff's toe was still very painful, and Dr. Sen noted that he

was going to consult with another doctor. *Id.* Dr. Sen ordered that plaintiff's pain

medication be changed from Tylenol # 3 to Darvocet-N and renewed the Darvocet-

N prescription on October 13, 2000. *Id.* at B-21, 38.

Plaintiff was examined by Dr. Baldauf again on October 25, 2000. *Id.* at B-

68. Dr. Baldauf stated that plaintiff's toe was purple, cool to the touch, but very

painful when palpitated. *Id.* There was an ulcer on the distal toe with clean

drainage. *Id.* Dr. Baldauf stated that plaintiff had "pre-gangrene", secondary to

Buerger's disease, and a possible infection because the antibiotics were not

"reaching" the toe. *Id.* Plaintiff required "aggressive care" which might involve

amputation of his toe. *Id.* Dr. Baldauf recommended a surgery consultation as soon

as possible. *Id.* Dr. Sen sent plaintiff to Oneida City Hospital on the same day. *Id.*

at B-43.

The emergency room doctor at Oneida City Hospital noted a purplish color,

swelling and small ulcers on plaintiff's right first toe. *Id.* at B-69. It was

determined that plaintiff's condition was due to his Buerger's disease and that he

should receive a vascular consultation as an outpatient, his pain medications should

be increased, he rest and elevate his feet, and that he be given additional Keflex. *Id.*

On October 26, 2000, Dr. Sen arranged for and plaintiff was admitted to SUNY for

further procedures. *Id.* at B-43.

13

Plaintiff remained at SUNY for seventeen days. *Id.* at 70-71.  When he was admitted, he was started on intravenous antibiotics and daily dressing changes with Silvadene. *Id.* at 71.  Plaintiff underwent removal of the toe nail of his right great toe. *Id.*  Plaintiff also underwent a lumbar sympathetic block for his pain. *Id.* Although plaintiff was adamant that his toe be amputated, the surgical team decided that the toe would heal on its own, and it did improve throughout plaintiff's hospital stay. *Id.*  Plaintiff was discharged back to the Oneida infirmary on November 12, 2000. *Id.* at 23, 43, 72-76.  Plaintiff was prescribed Tylenol with codeine for pain. *Id.*  On November 13, 2000, Dr. Sen noted that plaintiff needed an appointment with Dr. Sobel, a vascular surgeon within two weeks. *Id.* at 43.

Although there was some indication that plaintiff's wounds were healing, plaintiff continued to experience pain in his right great toe, as evidenced by the progress notes in Exhibit B. Defendants' Ex. B-43-49.  On **December 7, 2000**, a nurse practitioner noted that although plaintiff stated that his toe was "healing well", he still had pain, especially in the cold. *Id.* at 49.  The nurse practitioner then stated that plaintiff was asking about "special boots" and told the nurse practitioner that the "state boots caused all of this problem initially." *Id.*

Plaintiff was examined at the vascular surgery clinic at SUNY on December 11, 2000.  The doctor's note indicates that plaintiff's leg ulcers were healed, but that plaintiff also had a "known history" of Raynaud's Phenomenon, for which he

14

should be referred to a specialist. *Id.* at B-84.  The doctor also stated that plaintiff

needed "protective" shoes in order to avoid sores and that he should not be forced

to wear "the closed boots" due to his foot injury. *Id.*  The doctor also noted that

plaintiff should wear gloves in winter months to protect against ischemia. *Id.*  The

doctor specifically ordered that plaintiff not wear boots for two months. *Id.* at B-85.

On December 12, 2000, it was noted in plaintiff's facility health record that

he needed to see "Mr. Lis" for special shoes. *Id.* at B-25.  On December 13, 2000, it

was noted on plaintiff's health record that he needed to wear gloves in the winter.

*Id.*  Dr. Sen then put in a request for a rheumatology consultation. *Id.* at 25, 137.

Plaintiff received his gloves and heavy socks on January 3, 2001. *Id.* at 58.  Special

low boots were ordered for plaintiff on January 3, 2001, but when they arrived they

were too big and had to be reordered. *Id.* at 14, 86, 97.  Plaintiff received his boots

on March 27, 2001. *Id.* at 100.

On January 8, 2001, plaintiff was discharged to general population by Dr.

Mara, but continued to be housed in the infirmary until the weather became warmer.

*Id.* at 16, 59, 87.  Plaintiff was told to have his blood pressure taken weekly and was

prescribed hypertension medication. *Id.*  He was also instructed to wear gloves and

socks at all times. *Id.*  Plaintiff was also examined by a rheumatologist at SUNY on

January 18, 2001, Dr. Paul Phillips, and a cardiologist, Dr. Zugibe, at the Walsh

Regional Medical Unit on January 23, 2001. Defendants' Ex. B-88-96.

Plaintiff was examined by Dr. Mara on March 6, 2001 for complaints of pain and blue color in the second toe on his right foot. *Id.* at 97.  Dr. Mara diagnosed ischemic changes in the "2nd great toe," prescribed Percocet for pain, and told plaintiff to wear double socks and keep his foot in warm water. *Id.*  Plaintiff saw Dr. Mara on March 7, 13, and 18, 2001 for the pain in his toe. *Id.* at 98.  Plaintiff's Percocet prescription was renewed, and on March 18, Dr. Mara changed plaintiff's medication to Darvocet, noted that plaintiff's toe was still purple, tender, and warm to the touch. *Id.*  Dr. Mara reminded plaintiff that he was to wear double socks. *Id.*

On March 22, 2001, plaintiff complained to Dr. Mara of pain in his right second toe, and Dr. Mara's notes indicate that plaintiff had stopped wearing socks, and that this was causing pressure on the toe. *Id.* at B-99.  Dr. Mara noted that plaintiff's toe was more discolored and tender to the touch. *Id.*  The plaintiff was re-admitted to the Oneida infirmary on March 23, 2001. *Id.* at B-101-02.  On April 4, 2001, plaintiff was examined in the Vascular Surgery Department at SUNY for the condition of the second toe on his right foot. *Id.* at B-135-37.  The doctor noted that the great toe had healed and that the swelling had almost completely resolved. *Id.* at B-137.  The doctor stated that given the drastic improvement in plaintiff's great toe with conservative management, it was possible that the second toe would also improve. *Id.*

However, by May 5, 2001, the vascular surgeon at SUNY noted that the

second toe on plaintiff's right foot had developed gangrene and had to be amputated. *Id.* at B-140-41.  Plaintiff had been issued a permit to wear sneakers during any medical trips outside of the facility infirmary. *Id.* at B-121, 139.  On May 8, 2001, the Oneida medical staff issued a request for plaintiff to have surgery. *Id.* at B-121, 140.  On May 17, 2001, Dr. Mara noted that surgery had not yet been scheduled, and he placed a telephone call to the DOCS health maintenance organization to explain that plaintiff needed urgent surgery. *Id.* at B-124, 125.  On May 17, 2001, plaintiff went to the rheumatology clinic at SUNY, and the doctor there noted that plaintiff needed surgery for probably amputation. *Id.*  Plaintiff's toe was amputated at SUNY on May 30, 2001, and he returned to the infirmary at Oneida for post-operative care. *Id.* at B-144-46.  Plaintiff was finally discharged from the infirmary to general population on June 25, 2001. *Id.* at B-102, 106, 134, 147.

Plaintiff was prescribed medications and told to wear gloves and socks. *Id.* at B-102, 106, 147, 149.  Plaintiff did not appear for an appointment with Dr. Mara on July 2, 2001. *Id.* at B-148.  On July 3, 2001, plaintiff told Dr. Mara that he had no complaints, and Dr. Mara noted that the incision line was clean, healed, and dry with no discharge. *Id.*  Dr. Mara also issued plaintiff a three month permit for a bottom bunk. *Id.* at B-149.

Plaintiff filed two grievances, the first on October 23, 2000 at Oneida,

17

complaining of inadequate care for his Raynaud's disease while at Elmira.

Defendants' Ex. C-1.  Although the relief he requested was assistance in filing a

case against Elmira and its medical staff for inadequate medical care, the grievance

itself outlined his complaints about his medical care at Elmira, including his claim

that his Unna boots were too tight and his alleged request to get a permit to wear his

sneakers. *Id.*  The grievance was denied by the IGRC, focusing more on his medical

care issues, and stating that plaintiff's medical records had been reviewed by Nurse

Administrator DiMaggio, who stated that Unna boots did not obstruct circulation

and there was no documentation that plaintiff had ever requested sneakers. *Id.* at C-

3.  Plaintiff appealed both to the Superintendent and to the CORC. *Id.* at C-4-5.

The CORC stated in its denial of plaintiff's appeal that he was ***housed in the***

***infirmary***, and that there was no indication that plaintiff required special footwear.

*Id.* at C-6.

Plaintiff's second grievance dealt with a complaint regarding the accessibility

of paralegals from the law library. Defendants' Ex. D-1.  Plaintiff requested to have

a paralegal from the law library come to the infirmary and assist plaintiff in filing a

notice of intention. *Id.*  On January 16, 2001, the IGRC issued a decision which

upheld plaintiff's grievance in part.  The IGRC noted that plaintiff's legal work had

been prepared for him and delivered to him on January 3, 2001. *Id.* at D-3.  Plaintiff

only had to sign and mail the documents. *Id.*  Plaintiff appealed to the

Superintendent and to the CORC. *Id.* at D-4-5.  The decision of the IGRC was

upheld, and plaintiff was directed to contact the Law Library Officer directly

regarding his request for assistance. *Id.* at D-6.

**4.     Eleventh Amendment**

Plaintiff seeks damages against the defendants in their "official" as well as

individual capacities.  It is now well-settled that the state itself cannot be sued

under section 1983. *Komlosi v. New York State OMRDD*, 64 F.3d 810, 815 (2d Cir.

1995)(citing *Will v. Michigan Department of Police*, 491 U.S. 58, 71 (1989)).  This

is true whether the court is considering Eleventh Amendment immunity or a

statutory interpretation of section 1983. *Id.* at 815 n.3.  An action against state

officers in their official capacities is tantamount to an action against the state.

*Yorktown Medical Laboratory v. Perales*, 984 F.2d 84, 87 (2d Cir. 1991).  Thus, to

the extent that the complaint seeks damages against defendants in their "official

capacities", the complaint may be dismissed.  The complaint may proceed as against

the defendants in their "individual capacities."

**5.     Respondeat Superior**

Personal involvement is a prerequisite to the assessment of damages in civil

rights actions. *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.), *cert. denied*,

434 U.S. 1087 (1978).  The doctrine of respondeat superior is inapplicable to

section 1983 claims.  *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Johnson v.*

*Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033 (1973).

In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved, and thus be subject to individual liability, in a constitutional deprivation.  A supervisory official is said to have been personally involved if that official directly participated in the infraction.  *Id*.  A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong.  *Id*.  Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue.  *Id*.  Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event.  *Id*.

Plaintiff has named Glenn Goord, the Commissioner of DOCS; Floyd Bennett, the Superintendent of Elmira; and M.L. Hollins, the Deputy Superintendent for Programs at Oneida as defendants.  These defendants argue that plaintiff has not shown the requisite personal involvement of these defendants to maintain a claim for damages against them.  Plaintiff argues in his response to the motion for summary judgment that these individuals were supervisors and were "aware" of plaintiff's medical problems through the "various grievances" that he wrote.

The court would first point out that defendant Goord is the Commissioner of DOCS in Albany, and was in no way involved in either plaintiff's medical care or in the two grievances that plaintiff submitted concerning his medical care and his access to courts.  Any claims against defendant Goord would be based solely upon a theory of respondeat superior, which as stated above, is insufficient for damage liability in a section 1983 case.  Thus, the amended complaint may be dismissed as against defendant Goord.

There are also no claims that defendant Floyd Bennett was aware of plaintiff's medical problem when he had the opportunity to correct any alleged deficiencies in treatment, even assuming that the Superintendent supervised the medical department.  Plaintiff's grievances were both filed after he left Elmira and was in Oneida Correctional Facility.  There is no indication, either in the amended complaint or in the medical records in this case that defendant Bennett was in any way personally involved in plaintiff's claims.  Plaintiff never mentions Bennett, other than in the section describing the defendants and in the relief section of the amended complaint.  Thus, this case should be dismissed as against this defendant.

Although plaintiff states that he filed "various" grievances, there are only two grievances in the record.  Both were filed in Oneida Correctional Facility, and the first was filed on October 23, 2000 and appeared to be complaining about the events at Elmira Correctional Facility, and the relief requested was assistance in

21

filing a law suit against Elmira. Defendants' Ex. C-1.  Once again, plaintiff never mentions that defendant Hollins was personally involved in any violations of plaintiff's rights.

It is unclear who signed the disposition of plaintiff's Oneida grievance appeal,[10] but the grievance appeared to be for something that happened in another facility, not in defendant Hollins's facility.  Even if he did sign the Superintendent's response, this would not make him personally responsible for any violations of plaintiff's right to constitutionally adequate medical care that occurred in another facility and over which defendant Hollins would have had no control.  The second grievance that was filed at Oneida was regarding legal assistance, and the grievance was accepted in part.  There is no indication that defendant Hollins was involved in any alleged violations.  With respect to the legal claim, even if defendant Hollins could be said to have been personally involved, the case may also be dismissed on the merits of that claim as discussed below.  Thus, this case may be dismissed as against defendant Hollins.

## 6.    **Medical Care**

In order to state a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to

---

[10] The signature is almost illegible, but it does appear to be Hollins's signature. Defendants' Ex. C-4.

evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A plaintiff must allege that his access to physicians for necessary medical care was unreasonably delayed or denied, or that prescribed medical treatment was not administered. *Tomarkin v. Ward*, 534 F. Supp. 1224, 1240 (S.D.N.Y. 1982) (citing *Todaro v. Ward*, 431 F. Supp. 1129, 1133 (S.D.N.Y.)), *aff'd*, 565 F.2d 48 (2d Cir. 1977).

The court would point out that disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y. 1992). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id*. (citations omitted). An inmate does not have the right to treatment of his choice. *Id*. (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)); *Jackson v. Fair*, 846 F.2d 811, 817-18 (1st Cir. 1988) Additionally, negligence by physicians, even amounting to malpractice does not become a constitutional violation because the plaintiff is an inmate. *Estelle*, 429 U.S. at 107. *See also Daniels v. Williams*, 474 U.S. 327, 332 (1986)(negligence not actionable under section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under section 1983.

The court notes that in this case, plaintiff was only incarcerated at Elmira between August 9, 2000 and August 28, 2000. Dr. Yin was only responsible for plaintiff's medical care during that time. Plaintiff alleges in his amended complaint

23

that he noticed the ulcers on August 10, 2000.  However, plaintiff's medical records show that plaintiff had been treated for ulcers when he was incarcerated at Wende and had been prescribed the antibiotic Augmentin on August 3, 2000, to be taken until August 8, 2000. Defendants' Ex. B-4.  On August 7, 2000, plaintiff had asked for more Augmentin, and the nurse stated that she would speak to the doctor about it, but there is no further prescription. *Id.*  On August 7, two days prior to plaintiff's transfer to Elmira, he was given "Band-aids" for his ulcers. *Id.*  Plaintiff's transfer documents stated plaintiff's condition and noted that plaintiff had been given Augmentin that was discontinued August 8, 2000. Defendants' Ex. B-1.  The transfer documents also indicated that plaintiff's ulcer was on the medial ankle, it was a "25¢ size" and was "drying up. *Id.* at B-2.

Plaintiff was examined by a nurse upon his admission to Elmira. *Id.* at B-3. All plaintiff's conditions were noted. *Id.*  Plaintiff had a routine physical performed by Dr. Yin on August 21, 2000.  There is no indication that between August 9 and August 21 he asked defendant Yin for anything or even that he knew who the doctor was.  Plaintiff alleges that although Dr. Yin examined plaintiff on August 21, he sent plaintiff back to population "untreated" and that after plaintiff spoke to the doctor, it took plaintiff two weeks to obtain treatment. Amended Complaint ¶ 12. The medical records do not support plaintiff's allegation.  While Dr. Yin may not have prescribed anything for plaintiff on August 21, 2000, he did give plaintiff a

complete physical and noted that the ulcers had crusts and that prescriptions for the ulcers would be "as needed." Defendants' Ex. B-6.

Plaintiff wrote a note to the charge nurse on August 22, 2000 about his Albuterol refill.  It was in ***this note*** that plaintiff requested topical as well as oral antibiotics for his leg ulcers. Defendants' Ex. B-11.  Plaintiff's Albuterol prescription was renewed on August 24, and plaintiff was examined by Dr. Yin for the ulcers on August 25, 2000, only three days after plaintiff wrote the note. *Id.* at B-4, B-12.  As a result of that examination, Dr. Yin prescribed the Unna boots. *Id.* at B-12.  Dr. Yin states in his affidavit that he did not prescribe antibiotics because there was no sign of infection at the time, and that plaintiff's white blood cell count[11] showed that antibiotics were not indicated. Yin Aff. ¶ 8.  Dr. Yin also prescribed Motrin. *Id.*

There is no indication on the medical records that plaintiff asked for either "special shoes" or for a permit to wear his sneakers.  Dr. Yin stated in his affidavit that, based on his examination, special shoes were "medically indicated." Yin Aff. ¶ 8.  The grievance appeal that plaintiff filed after he arrived at Oneida stated that the Unna boots were not the problem, but rather the fact that he had to wear his state-issued boots with the Unna boots and without socks. Defendants' Ex. B-4-5.

---

[11] The blood work was performed in conjunction with plaintiff's August 21, 2000 physical examination. Defendants' Ex. B-9-10.

Since plaintiff was transferred only three days after the examination, there was no way of knowing how the Unna boots were going to affect plaintiff's ability to wear his regular shoes and that plaintiff was not going to wear socks with the Unna boots. Plaintiff's claim that Dr. Yin should have prescribed antibiotics is merely a disagreement with the doctor's treatment and is not actionable under section 1983. Even if Dr. Yin's failure to prescribe antibiotics rose to the level of malpractice, it still would not be actionable under section 1983.

Based on the information in the record, plaintiff has not raised a material question of fact regarding Dr. Yin's care, and the complaint may be dismissed as against this defendant.

Plaintiff was evaluated as soon as he arrived at Oneida. He arrived on August 29, 2000 and by August 30, 2000, plaintiff had already been evaluated for his conditions. Defendants' Ex. B-12. On August 30, 2000, Dr. Sen ordered plaintiff's Unna boots to be changed, and ordered an alternative dressing applied because there was not Unna boot material in stock. *Id.* By September 1, 2000, plaintiff had already been prescribed antibiotics which were continued on September 5, 2000. *Id.* at B-17. Also by September 5, 2000, Dr. Sen had requested an appointment with a vascular surgeon for plaintiff. *Id.* As stated in depth above, plaintiff was examined extensively throughout his stay in Oneida. He spent a several months in the facility infirmary. His leg ulcers ultimately healed well, and

although he did have to have his toe amputated, conservative treatment was attempted prior to full amputation.

Plaintiff seems to take issue with his initial stay in Oneida, prior to his admission to the infirmary.  Plaintiff argues that without special shoes or the ability to wear sneakers, his toes became compressed, and that is what caused the problem with his feet.  However, by September 1, 2000, plaintiff had already been admitted to the infirmary, where his condition was monitored around the clock. Defendants' Ex. B-27.  The court also notes that although plaintiff states that he told the doctors about his Raynaud's Phenomenon, there is no mention of problems with this condition until December 11, 2000, when the SUNY physician stated that plaintiff had a history of Raynaud's and should be seen by a specialist about it. Defendants' Ex. B-84.  The reason that the Raynaud's may not have been a problem initially, or noted in the medical records initially, is because plaintiff was first incarcerated in August, and Raynaud's Phenomenon usually occurs as the result of exposure to cold.  When this condition became a problem, plaintiff was advised to wear double socks and was allowed to remain in the infirmary until the weather became warmer even after he would have been discharged. *Id.* at 16, 59, 87.  It should be noted that on March 23, 2001, after plaintiff's discharge, Dr. Mara noted that although plaintiff had been instructed to wear double socks, he was not doing so, and Dr. Mara again admitted plaintiff to the Oneida infirmary for observation of his

condition. *Id.* at B-101-02.  Plaintiff remained in the infirmary until he was discharged on June 25, 2001. *Id.* at B-102-43.

Ultimately, plaintiff did get a prescription for special boots, and when they were initially made too large, another pair was made for him. *Id.* at B-97, 100. Although plaintiff states in his amended complaint that on October 25, 2000, he was given a medical permit to wear only sneakers, a review of plaintiff's medical records for that date does not reveal ***any mention*** of sneakers or that a medical permit was given to plaintiff at that time. Defendants' Ex. B-68-72.  The record shows that plaintiff was at SUNY on October 25, 2000, and told Dr. Lucio Pavone that plaintiff's toe problems began in early September when plaintiff started wearing a new pair of boots. *Id.* at B-70.  Although the doctors at SUNY recommended a surgical consultation, an increase in plaintiff's Keflex, a vascular consultation, rest, and elevation there is no mention of footwear. *Id.* at B-69.  In any event, when plaintiff returned to the facility, he was still housed in the infirmary.

Dr. Sen had little or no involvement in plaintiff's care after October of 2000. Dr. Mara appears to have taken over plaintiff's care.[12]  A review of the record shows that defendants have carried their burden to show that there is no question of material fact regarding plaintiff's medical care, and plaintiff has raised no issue in

---

[12] The court notes that Dr. Mara is a defendant in another civil rights action brought by this plaintiff in the Northern District of New York complaining about his medical care. 02-CV-1089.

his response.  There is no question that plaintiff has a serious condition.  Plaintiff

had already had two amputations before he was ever brought to Elmira or Oneida.

There is also no question that his condition is painful.  However, based on the

record, there is no indication that the doctors were deliberately indifferent to

plaintiff's serious medical needs.  Although plaintiff claims that when he initially

arrived at Oneida, he was forced to carry his belongings around and that without

special shoes, this created problems for him, there is no indication that he asked ***Dr.

Sen*** for special footwear, and that this was denied to him.  When the record shows

that special footwear was prescribed, plaintiff was provided that footwear.

Additionally, on ***May 7, 2001***, plaintiff was issued a "sneaker pass" in order that

plaintiff might wear sneakers when going on medical trips outside the infirmary.

Defendants' Ex. B-139.  Thus, based on the evidence, the action may also be

dismissed as against Dr. Sen.

**7.**     <u>**Access to Courts**</u>

          In *Bounds v. Smith*, 430 U.S. 817 (1977), the Supreme Court held that access

to the courts is a fundamental right that requires prison authorities to "assist inmates

in the preparation and filing of meaningful legal papers by providing prisoners with

adequate law libraries or adequate assistance from persons trained in the law."  The

Supreme Court has also held that an inmate alleging a denial of access to courts

must show actual injury as a result of the deficient access to courts. *Lewis v. Casey*,

518 U.S. 343 (1996).  The ***cause of the injury*** must be inadequacy of the access.

*Id.* at 351.  Plaintiff must show that a non-frivolous legal claim was frustrated or

impeded due to the actions of prison officials. *Warburton v. Underwood*, 2 F. Supp.

2d 306, 312 (W.D.N.Y. 1998)(quoting *Lewis v. Casey*, 518 U.S. at 353).

Plaintiff in this case filed two grievances, one requested that he be assisted in

filing a complaint against Elmira medical staff, and the second requested that law

library clerks be allowed to come into the infirmary in order to assist plaintiff with

his legal work.  The first grievance was interpreted as a medical care grievance, but

the second grievance was accepted to the extent that plaintiff's legal work was

prepared for him by the law clerks and delivered to the infirmary for him to sign

and mail. Defendants' Exs. C & D. Plaintiff has ***not*** alleged that he was prevented

from filing an action or that he suffered any actual injury as a result of defendants

actions.

In his second grievance, plaintiff wanted the rules to be changed regarding

inmate law clerks being able to assist plaintiff ***in the infirmary***, rather than simply

having the completed work delivered to him.  In his appeal, plaintiff stated that he

wanted to be able to ask someone questions about the papers. Defendants' Ex. D-4-

5.  The response to plaintiff's appeal stated that the facility administration was in

the process of implementing a new policy whereby the law clerks would have

access to the infirmary to assist the inmates housed there. Defendants' Ex. D-6.

Plaintiff was also told to contact the Law Library officer regarding the request for assistance. *Id.* Thus, plaintiff essentially obtained the relief that he sought in his appeal, and he cannot show that he suffered any actual injury to a legal case or claim as a result of any of the defendants' actions.

The court would also note that with respect to his legal access claim, the only defendants that might have been "personally involved" with his claim are a former inmate who was the IGRC supervisor and as stated above, perhaps defendant Hollins. The former inmate was not a state actor for purposes of section 1983, and defendant Hollins is being sued only under a theory of respondeat superior. Thus, plaintiff's legal access claim may be dismissed under various bases.

**WHEREFORE,** based on the above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (dkt. no. 49) be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: September 30, 2004

_____

Hon. Gustave J. DiBianco
U.S. Magistrate Judge

31